UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLOBAL TECHNOLOGY, INC.,

        Plaintiff,

                                     Case No. 05-CV-70069
vs.                                 HON. GEORGE CARAM STEEH

MOTO DIESEL MEXICANA,

        Defendant.

_____/

ORDER DENYING PLAINTIFF'S FIRST MOTION FOR SUMMARY JUDGMENT(# 47);
DENYING PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT (#48);
DENYING PLAINTIFF'S THIRD MOTION FOR SUMMARY JUDGMENT (#49); AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#50)

      Plaintiff Global Technology Company (GTI) moves in three separate motions for summary judgment of its breach of contract claim and defendant Moto Diesel Mexicana's (MDM) breach of contract, tortious interference with contract, and tortious interference with business expectancy counterclaims. MDM moves for summary judgment of GTI's breach of contract claim. A hearing was held on April 16, 2007. For the reasons set forth below, GTI's motions for summary judgment will be DENIED. MDM's motion for summary judgment will be DENIED.

## I. Background

      GTI filed a First Amended Complaint on April 22, 2005, alleging it executed a September 1, 1999 "Manufacturer's Representative Agreement" (1999 Agreement) with motor vehicle component manufacturer MDM, wherein GTI agreed it would act as MDM's

sales representative. The 1999 Agreement was allegedly amended on July 13, 2000 (2000 Amendment), and modified again on November 18, 2004 (2004 Amendment). GTI alleges that the 2004 Amendment reduced commission rates payable to GTI on invoice payments received by MDM after September 1, 2004, conditioned upon MDM making an immediate payment on existing arrearage. MDM allegedly failed to make the arrearage payments and defaulted under the 2004 Amendment. GTI alleges that, by operation of this default, MDM now owes commissions calculated at the higher rates set forth in the 2000 Amendment. Count I alleges breach of contract for failing to pay commissions. Count II seeks an accounting. Count III seeks treble damages and attorney fees under the Michigan Sales Commission Act, M.C.L. § 600.2961.

MDM filed counterclaims on December 13, 2005 alleging GTI agreed in the 1999 Agreement to act as MDM's exclusive sales agent to companies such as General Motors and Ford. MDM alleges the 1999 Agreement also expressly prohibited GTI from acting as a sales representative for any direct competitor of MDM. MDM alleges that the 2000 Amendment added Visteon to GTI's customer service list. MDM alleges GTI thereafter acted as MDM-competitor By-Tec, Inc.'s sales agent for the sale of "Center Bearing Assemblies" to Visteon, a component manufactured by MDM for Visteon. Counterclaim I alleges tortious interference with MDM's Visteon contract. Counterclaim II alleges GTI breached the 1999 Agreement by representing By-Tec. Counterclaim III alleges tortious interference with MDM's business expectancy with Visteon.

The record indicates that GTI and MDM executed a "Mutual Secrecy Agreement" on August 18, 1999, limiting GTI's disclosure of MDM confidential information. In September, the parties executed the 1999 Agreement, which reads in part:

It is expressly understood and agreed that Representative [GTI] shall be permitted during the term of this Agreement to provide sales representation services for other persons, firms or corporations who are not in direct competition with MDM.

Schedule B attached to the 1999 Agreement provided for the payment of "value added" commissions:

Commissions of 5% will be calculated on the value added portion of work being performed by MDM. Value added shall be determined by taking the invoice price and deducting therefrom MDM's actual cost for:

1.) Materials and/ or purchased by or considered to MDM from a third party.

2.) Freight charges which MDM not reimbursed or which are not passed through by MDM cost to the customer.

All other items, including but not limited to, labor, overhead handling charges and mark-ups on otherwise deductible costs, shall be subject to commission.

Sometime in late 1999 or early 2000, GTI and non-party B.C. Evans & Associates, Inc. (BCE), through BCE's sole owner Bret Evans, agreed that BCE would act on GTI's behalf at Visteon for the sale of MDM machined engine assemblies and components.

On July 13, 2000, GTI and MDM executed the 2000 Amendment, covering a five-year period through August 31, 2004. The 2000 Amendment states in part:

[I]n regards to account coverage, we mutually agree to add Visteon to our agreement for account responsibility.

The last item of discussion is related to commission percentages. As we agreed (on engine assemblies), the cost of the raw material is so excessive that we would accept a commission on the value added portion of the engine assembly. As we discussed, [GTI] would be compensated at a rate of 5% commission on the entire sales price, including raw materials for those products and accounts other than engine assemblies.

As we outlined during dinner last week, [GTI] would accept a 60-day moratorium on commissions for the raw material costs associated with new jobs. This is intended to allow MDM to launch new projects where start up costs and scrap rates on the raw materials are larger than normal. After the

60-day moratorium on raw material commissions, [GTI] would then receive commission on the entire sales price, including the raw material portion of the sales price.

On March 21, 2003, MDM and Visteon executed a "Purchase and Supply Agreement," effective January 1, 2003 through December 31, 2006, wherein MDM and Visteon agreed that Visteon would purchase 100 percent of Visteon's requirements for specific parts, including a "Yoke/Center Bearing Assembly." MDM began experiencing financial difficulties in 2003, and on October 24, 2003, GTI agreed to defer receiving commission payments from MDM until 2004.

Effective October 25, 2003, GTI formally contracted with By-Tec on January 24, 2004 to represent By-Tec. Meanwhile, MDM's financial difficulties continued. MDM advised Visteon in May 2004 that MDM needed financial assistance to continue operations, leading to the execution of a May 19, 2004 "Accommodation Agreement" under which Visteon advanced MDM $580,000.00, and MDM agreed to repay the monies by June 4, 2004. On June 1, 2004, however, MDM advised Visteon that it could not repay the advance by June 4, 2004, and if required to do so, MDM ran the "high risk" of ceasing production. Three days later, on June 4, 2004, MDM asked Visteon to extend MDM a $1.5 million advance or face the probability of a production "shut down." Visteon began contacting other companies as alternative manufacturing sources for the Center Bearing Assemblies. One of those companies was By-Tec.

During this same time period, MDM gave GTI three months written notice on May 31, 2004 that MDM was electing to terminate the parties' contract effective August 31,

2004, as provided for under the 1999 Agreement[1].  On June 15, 2004, GTI and By-Tec formally terminated their January 2004 sales representative agreement, effective June 1, 2004.  In June 2004, BCE, through its owner Bret Evans, began communicating with By-Tec regarding Visteon's Center Bearing Assembly requirements.  Evidence in the record indicates Evans  transferred and e-mailed technical information to By-Tec on June 15, 2004, e-mailed a "Process Flow Chart" to By-Tec on June 24, 2004, and e-mailed pricing information to By-Tec on July 23, 2004.  Visteon e-mailed Evans on July 28, 2004, authorizing By-Tec to begin producing prototype Center Bearing Assembly tools and parts.  On August 12, 2004, BCE formally contracted with By-Tec to act as its sales representative.  Approximately two weeks later, on August 25, 2004, Visteon notified By-Tec that it was selected as Visteon's sole source supplier for Center Bearing Assemblies.  A day after By-Tec was awarded the production contract, August 26, 2004, Bret Evans of BCE notified MDM by e-mail that BCE was no longer acting as MDM's sales representative at Visteon.

On November 18, 2004, GTI and MDM executed the 2004 Amendment.  The 2004 Amendment reads in part:

> 1.  The Manufacturer's Representative Agreement, effective September 1, 1999, (hereinafter referred to as the "MRA") . . . is extended pursuant to paragraph 3 thereof for a second five (5) year term.
>
> *       *       *
>
> 3.  The "Territory" identified on Schedule A attached to the MRA, is hereby

---

[1] "Termination.  This agreement may only be terminated as follows: . . . (b) At least three (3) months prior to the end of the current term of this Agreement either party may give notice to the other that the Agreement shall terminate at the end of the then current term." 1999 Agreement, ¶ 6(b).

modified to reflect the addition of Visteon, a former subsidiary of Ford Motor Company . . . .

4.  Except as otherwise stated herein the terms of the MRA shall remain in full force and effect.

5.   MDM shall immediately begin to reduce the amount of past due commissions owing to Representative [GTI] by complying with Schedule B attached to this Agreement.

Upon execution of this Agreement MDM shall pay to Representative the October 4 payment as provided in Schedules A and B attached to this Agreement.  Thereafter all future payments in accordance with Schedules A and B shall be made by MDM on or before the 20th of each month as provided in the MRA.  It is agreed that time shall be of the essence.

6.   Commencing with invoice payments received by MDM on or after September 1, 2004, Representative and MDM agree upon a reduced commission structure as set forth in Schedule A attached to this Agreement.

7.  In the event MDM shall default in its obligation to make timely payments as provided in Schedule B attached to this Agreement, then Schedules A and B, attached to this Agreement, shall be deemed null and void and Schedule B attached to the MRA shall be retroactively applied to all invoice payments received by MDM on or after September 1, 2004 and all past due commissions shall be immediately paid by MDM to Representative.

With respect to the October 4 payment referred to in paragraph 5, Schedule B attached to the 2004 Amendment reads that "[u]pon execution of this Agreement MDM shall pay Representative [GTI] commissions, based on the invoice payments received by MDM in the prior month (September, 2004) plus an additional $30,000 (USD)."  MDM did not make the payment.

On January 7, 2005, GTI received a December 2004 Report from MDM indicating that MDM owed GTI a total of $855,925.98 in accrued sales commissions as of December 31, 2004.  GTI filed this lawsuit the same day.  Visteon notified MDM at a January 31, 2005 meeting held at Visteon that MDM was "de-sourced" as Visteon's supplier of Center

Bearing Assemblies. GTI served MDM with this lawsuit at the same meeting. On February 18, 2005, GTI sent MDM a written notice of the termination of their contract.

## II. Cross-Motions for Summary Judgment

GTI moves for summary judgment of its breach of contract claim arguing MDM is estopped from denying liability of at least $855,925.98 based on MDM's December 2004 Report, MDM's admissions, and MDM's pre-suit conduct. MDM moves for summary judgment of GTI's breach of contract claim arguing GTI forfeited its right to all commissions by first breaching the contract and breaching a duty of loyalty by assisting By-Tec in acquiring the Center Bearing Assembly contract from Visteon. GTI moves for summary judgment of MDM's breach of contract counterclaim arguing By-Tec was not a "direct competitor" of MDM, GTI is not responsible for the alleged acts of BCE and Bret Evans, and MDM first breached the contract by failing to pay commissions. GTI moves for summary judgment of MDM's tortious interference counterclaims arguing MDM cannot prove GTI caused Visteon to de-source MDM.

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

251-52 (1986)).  The evidence and all reasonable inferences arising therefrom must be construed in a light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Redding</u>, 241 F.3d at 532 (6th Cir. 2001).  If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 270 (1968); <u>see</u> <u>also</u> <u>McLean v. 988011 Ontario, Ltd.</u>, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence. <u>Anderson</u>, 477 U.S. at 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  <u>McLean</u>, 224 F.3d at 800 (citing <u>Anderson</u>, 477 U.S. at 252).

### A. Equitable Estoppel/Admissions

GTI argues in its first motion for summary judgment that MDM is equitably estopped from denying contractual liability of at least $855,925.98.  Equitable estoppel applies where: (1) by representations, admissions, or silence, a party intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies upon these facts and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of these facts.  <u>Dimmitt & Owens Financial, Inc. v. Real Tek Industries, Inc.</u>, 90 Mich. App. 429, 433, 280 N.W.2d 827 (1979).  GTI argues it justifiedly relied on MDM's December 2004 Report as accurately reflecting the amount of commissions owed by MDM under the parties' contract, thus permitting GTI to justifiably rely on recovering a minimum of $855,925.98 in contract damages in this lawsuit.

In Dimmitt, the Michigan Court of Appeals affirmed the application of equitable estoppel, in favor of an assignee of accounts receivable and against the account debtor, based on the debtor's pre-assignment written acknowledgments of the debts to the assignor, and the trial court's credibility assessments following a bench trial. Dimmitt, 90 Mich. App. at 433-34. The assignee purchased the assignment of the accounts from the account creditor relying on the debtor's written acknowledgments of its debt. Id. at 433.

Dimmitt is distinguishable. Unlike the trial court's fact finding in Dimmitt following a bench trial, this court may not on summary judgment make a determination of MDM's credibility in now raising its contractual defenses. See Harris v. City of Akron, 20 F.3d 1396, 1403 (6th Cir. 1994) (citing Anderson, 477 U.S. at 252, 255). Dimmitt also did not involve counterclaims that, as here, could be applied as set-offs against GTI's recovery of contractual damages. Still further, GTI does not explain how MDM's December 2004 Report of $855,925.98 owing in commissions caused GTI to reasonably rely on MDM not filing counterclaims that GTI breached the contract or tortiously interfered with MDM's business relationship with Visteon. GTI has not shown beyond dispute that it relied on MDM's December 2004 Report to its detriment by filing suit under circumstances that caused GTI to reasonably believe that MDM could not raise any defenses or counterclaims to GTI's contract claim for $855,925.98. Dimmitt, 90 Mich. App. at 433; Amway Distributors, 323 F.3d at 390.

GTI's narrower argument is that MDM admitted in its Amended Answer that the higher commission rate in the 2000 Amendment applies to invoice payments received by MDM on and after September 1, 2004, instead of the lower "value added" rate set forth in the 1999 Agreement. GTI alleges in paragraph 15 of its First Amended Complaint:

9

15.  Upon Defendant's aforesaid default and in accordance with paragraph 7 of the November 2004 Amendment:

A.  Defendant is obligated to immediately pay Plaintiff all past due commissions; and,

B.  Commissions on invoice payments received by Defendant on and after September 1, 2004 are calculated in accordance with Schedule B to the September 1, 1999 Agreement, <u>as amended by the July, 2000 Amendment</u>, <u>and not in accordance with</u> the reduced commission structure set forth in Schedule A to <u>the November, 2004 Amendment</u>.

(emphasis added).  MDM answered:

15.  Answering the allegations contained in paragraph 15 of Plaintiff's First Amended Complaint, Defendant denies as untrue the allegations contained in subparagraph 15A for the reason that there are no past due commissions owed; <u>the allegations contained in subparagraph 15B are admitted</u>.

(emphasis added).

GTI's phrasing of paragraph 15B is in the conjunctive, averring that commissions are to be calculated under Schedule B of the 1999 Agreement as amended by the 2000 Amendment *and not* in accordance with the reduced commission structure of Schedule A of the 2004 Amendment.  MDM asserts that, consistent with its answer to paragraph 15B, Schedule A of the 2004 Amendment admittedly does not apply because, in accordance with paragraph 7 of the November 2004 Amendment, Schedule B of the initial 1999 Agreement controls, unaffected by the 2000 Amendment; MDM maintains that its answer to paragraph 15B is that, with MDM's admitted default under paragraph 7 of the November 2004 Amendment, commission rates reverted back to the rates set forth in the 1999 Agreement.

Pleadings are to be construed "as to do substantial justice," Fed. R. Civ. P. 8(f), and "in view of the prevailing practice of making final disposition of actions on the evidence

rather than the pleadings." McHenry v. Ford Motor Co., 269 F.2d 18, 25 (6th Cir. 1959). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principal that the purpose of pleading is to facilitate a proper decision on the merits." Federal Deposit Ins. Corp. v. Grant, 8 F.Supp.2d 1275, 1286 (N.D. Okla. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 48 (1957)). To that end, denials are required to only "fairly meet the substance of the averments denied." Fed. R. Civ. P. 8(b).

MDM's answer fairly meets the averments of paragraph 15 of GTI's First Amended Complaint by denying that any commissions are owing to GTI, and by admitting that, in accordance with paragraph 7 of the 2004 Amendment, commissions owing on invoice payments received after September 1, 2004 are *not* to be calculated in accordance with Schedule A of the 2004 Amendment. Construing MDM's answer to paragraph 15 in a manner that does substantial justice, MDM is not bound by an admission that the commission rates set forth in the 2000 Amendment apply by operation of MDM's default and "in accordance with paragraph 7 of the 2004 Amendment." Whether the 2000 Amendment calculation applies is a question of contractual intent that must be decided based on all of the evidence, including the 1999 Agreement, 2000 Amendment, and 2004 Amendment read as a whole, and the relevant surrounding circumstances including the parties' pre-suit conduct. See Cleveland v. Detroit Trust Co., 264 Mich. 253, 257, 249 N.W.2d 842 (1933). It is this evidence, and not MDM's answer to paragraph 15B read in isolation, that should provide the basis for deciding this lawsuit consistent with substantial justice. McHenry, 269 F.2d at 25; Grant, 8 F.Supp.2d at 1286. GTI is not entitled to summary judgment based on equitable estoppel and MDM's pre-suit conduct, or MDM's

asserted admissions.  <u>Amway Distributors</u>, 323 F.3d at 390.

## B. Breach of Contract

GTI argues MDM breached the 2004 Amendment by failing to make a $30,000.00 payment and the September 2004 commission payment on November 18, 2004.  MDM seeks summary judgment of GTI's breach of contract claim arguing GTI cannot recover *any* damages for this breach because GTI first breached the contract by earlier assisting By-Tec in acquiring the Visteon sole source contract for Center Bearing Assemblies, and forfeited all commissions by breaching a duty of loyalty.  GTI argues it is entitled to summary judgement of MDM's breach of contract counterclaim because MDM earlier breached the contract by failing to pay GTI its earned sales commissions.

A court's obligation in interpreting a contract is to discern the contracting parties' intent.  <u>Quality Products and Concepts Co. v. Nagel Precision, Inc.</u>, 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing <u>Sobczak v. Kotwicki</u>, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)).  This intent is determined from a reading of the instrument as a whole and in light of the surrounding circumstances.  <u>Detroit Trust</u>, 264 Mich. at 257.  If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy.  <u>Quality Products</u>, 469 Mich. at 375 (citing <u>Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel</u>, 460 Mich. 558, 570, 596 N.W.2d 915 (1999)); <u>Port Huron Ed. Ass'n v. Port Huron Area School Dist.</u>, 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing <u>Dykema v. Muskegon Piston Ring Co.</u>, 348 Mich. 129, 138, 82 N.W.2d 467 (1957)).  Extrinsic evidence may be used "to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists."  <u>Wonderland Shopping Center</u>, 274 F.3d 1085, 1095 (6th Cir.

2001) (citing Am. Anodco, Inc, v. Reynolds Metals Co., 743 F.2d 417, 422 (6th Cir. 1984)).

If the contract language remains unclear or susceptible to more than one meaning, contract

interpretation becomes a question of fact that must be decided by the fact-finder upon an

examination of the extrinsic evidence. Klapp v. United Insurance Group Agency, Inc., 468

Mich. 459, 453-454, 663 N.W.2d 447 (2003); Port Huron Ed. Ass'n, 452 Mich. at 323.

The 2004 Amendment clearly reflects the parties' intent to extend their contractual

relationship for "a second five (5) year term" under the terms of the 1999 Agreement

"[e]xcept as otherwise stated" in the 2004 Amendment. 2004 Amendment, ¶¶ 1, 4. When

the 2004 Amendment was executed on November 18, 2004, MDM agreed to "immediately

begin to reduce the amount of past due commissions owing to [GTI]" pursuant to Schedule

B attached to the 2004 Amendment. Id, ¶ 5. Schedule B of the 2004 Amendment required

MDM to pay GTI $30,000.00 in addition to sales commissions "based on the invoice

payments received by MDM" in September 2004. MDM further agreed that "time shall be

of the essence." 2004 Amendment, ¶ 5. Construing the evidence and this unambiguous

contract language in a light most favorable to MDM, MDM breached the 2004 Amendment

as a matter of law by failing to make its contractual payments to GTI on November 18,

2004. Quality Products, 469 Mich. at 375; Port Huron Ed. Ass'n, 452 Mich. at 323; Detroit

Trust, 264 Mich. at 257; Amway Distributors, 323 F.3d at 390.

The parties nonetheless dispute who first breached the contract, and therefore,

which party is entitled to contractual damages.

> Michigan law is settled: " 'He who commits the first substantial breach of a
> contract cannot maintain an action against the other contracting party for
> failure to perform.' " Ehlinger v. Bodi Lake Lumber Co., 324 Mich. 77, 36
> N.W.2d 311, 316 (1949), quoting Jones v. Berkey, 181 Mich. 472, 148 N.W.
> 375, 378 (1914). The determining factor in Michigan breach of contract cases

> . . . is therefore whether a first breach is "substantial." The Michigan Supreme Court has explained that a "substantial breach" is one "where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." McCarty v. Mercury Metalcraft Co., 372 Mich. 567, 127 N.W.2d 340, 343 (1964).

Chrysler International Corp. v. Cherokee Export Co., 134 F.3d 738, 742 (6th Cir. 1998). Whether a breach was "substantial" depends on the particular facts of the case. Id.

Construing the evidence and parties' contract in a light most favorable to MDM, a reasonable jury could conclude that GTI first substantially breached the contract by representing By-Tec at a time when By-Tec was a "direct competitor" of MDM. The 1999 Agreement unambiguously precluded GTI from acting as a sales representative for anyone "in direct competition with MDM." 1999 Agreement, ¶ 7. GTI began acting as By-Tec's sales representative, effective October 23, 2003, under a written January 24, 2004 "Sales Representative Agreement" which described By-Tek as "engaged in the business of electro mechanical assemblies." GTI argues that By-Tec was "not in direct competition with MDM" because MDM only manufactured machined parts, not electro mechanical assemblies.

A broader interpretation of the phrase "not in direct competition with MDM" is supported by the contract language and the surrounding circumstances. Detroit Trust, 264 Mich. at 257. As demonstrated by By-Tec's ability to acquire Visteon's sole source contract for Center Bearing Assemblies notwithstanding its self-described status as "engaged in the business of electro mechanical assemblies," By-Tec's potential for "direct competition" with MDM was not in fact limited to the nature of the components By-Tec was manufacturing on January 24, 2004 when it executed its "Sales Representative Agreement" with GTI. In June 2004, Visteon looked to By-Tec, a "manufacturer of electro mechanical assemblies,"

14

to directly compete against MDM as Visteon's sole source for manufacturing machined Center Bearing Assemblies. By-Tec began receiving sales and technical information about Center Bearing Assemblies from BCE's Bret Evans in June 2004. BCE did not formally notify MDM that it no longer represented MDM at Visteon until August 26, 2004, one day after Visteon awarded the Center Bearing Assemblies contract to By-Tec. Reasonable jurors could conclude that By-Tec became a "direct competitor" of MDM in June 2004, and that By-Tec remained a "direct competitor" of MDM until MDM was de-sourced by Visteon on January 31, 2005.

Given GTI's status as MDM's "exclusive sales representative" at Visteon during this same period of time from June 2004 through January 31, 2005 (1999 Agreement, ¶ 1; 2000 Amendment "add[ing] Visteon to our agreement for account responsibility"), BCE's contract with GTI to act as MDM's representative at Visteon, and the evidence that BCE did not terminate its relationship with MDM until August 26, 2004, reasonable jurors could also conclude that BCE acted under GTI's authority when assisting By-Tec in competing with MDM for the Visteon sole source contract. A principal may be held liable for acts committed by its agent under the agent's apparent authority. Smith v. Saginaw Savings & Loan Association, 94 Mich. App. 263, 271, 288 N.W.2d 613 (1980) (citing LaPointe v. Chevrette, 264 Mich. 482, 493, 250 N.W.2d 272 (1993)). Apparent authority must be traceable to the principal, and cannot be established by the acts and conduct of the agent. Id. The record evidence allows a finding that GTI did not terminate its agency relationship with BCE to act as GTI's representative at MDM, arguably allowing BCE continued access to MDM information concerning its manufacture and sale of Center Bearing Assemblies. MDM has come forward with evidence that GTI and its sole owner Dale Hadel, and BCE

and its sole owner Bret Evans, shared the same office address, suite number, computer, and e-mailer server. Hadel's denial of any knowledge that BCE was assisting By-Tec in acquiring the Visteon contract using information arguably covered by GTI's and MDM's August 18, 1999 "Mutual Secrecy Agreement," and Evans's testimony that he orally terminated his relationship with MDM before June 1, 2004, are not dispositive, particularly on summary judgment. Harris, 20 F.3d at 1403. Other evidence, such as the timing of GTI's June 15, 2004 termination of its contractual relationship with By-Tec – the same day BCE's Bret Evans began e-mailing Center Bearing Assembly information to By-Tec – raises a reasonable inference that GTI knew that By-Tec had become a competitor of MDM. Yet, the evidence indicates that BCE was permitted to continue representing MDM's interests under the authority of its agency relationship with GTI. Apparent authority to act for the principal must be determined from all of the surrounding facts and circumstances. Smith, 94 Mich. App. at 271 (citing Atlantic Die Casting Co. v. Whiting Tubular Products, Inc., 337 Mich. 414, 422, 60 N.W.2d 174 (1953)). Construing the evidence in a light most favorable to MDM, it remains possible for MDM to prove at trial that GTI substantially breached the parties' contract prior to MDM's November 18, 2004 breach by representing MDM "direct competitor" By-Tec through GTI's agent By-Tec. Smith, 94 Mich. App. at 271; Amway Distributors, 323 F.3d at 390.

GTI's argument that MDM cannot maintain its breach of contract counterclaim for the alleged June 2004 breach because MDM earlier breached the parties' contract by failing to pay commissions owing prior to June 2004 is not well taken. Any act by an injured party indicating an intent to continue the contract operates as a conclusive election to waive a breach, and exposes that party to liability for its subsequent breach of the contract. West

Branch Tank & Trailer, Inc. v. Searfoss, No. 194399, 1998 WL 2016554, at *1 (Mich. Ct. App. March 1998) (unpublished) (citing Schnepf v. Thomas L. McNamara, Inc., 354 Mich. 393, 397-98, 93 N.W.2d 230 (1958)).  GTI continued its contractual relationship with MDM through January 2005, waiving MDM's earlier non-payment as a substantial breach, and exposing GTI to contractual liability for its own subsequent breach.  Id.  This waiver does not preclude GTI from recovering contractual damages GTI incurred prior to GTI's alleged June 2004 breach, but simply deprives GTI of any excuse for its own subsequent non-performance.  Schnepf, 354 Mich. at 397-98; Chrysler International, 134 F.3d at 743 (recognizing that a first substantial breach precludes recovery of subsequent contractual damages).

MDM's argument that GTI forfeited its right to recover any commissions by breaching a duty of loyalty owed to MDM beginning in June 2004 is not well taken.  As a general rule, equity may be invoked against an agent for the forfeit of a commission where the agent acted in a dual capacity and against the interests of his principal.  See Greater Bloomfield Real Estate Co. v. Braun, 64 Mich. App. 128, 135-136, 235 N.W.2d 168 (1975) (quoting Sweeney & Moore, Inc. v. Chapman, 295 Mich. 360, 363, 294 N.W. 711, 712 (1940)).  At the same time, equity dislikes forfeitures and will restrict their effect as far as possible.  Hull v. Hosteller, 224 Mich. 365, 369, 194 N.W. 996 (1923).  A forfeiture operates as "a deprivation or destruction of a right in consequence of the nonperformance of some obligation or condition."  Michigan Oil Co. v. Dept. of Natural Resources, 148 Mich. App. 745, 757, 384 N.W.2d 777 (1986) (quoting Black's Law Dictionary (5th ed.), at 584-585). In Sweeny, relied upon by MDM,  whether a purchaser's real estate agent forfeited its right to a $687.50 sales commission was remanded for trial on the issue of whether a secret

"fee-splitting" arrangement existed between the purchaser's agent and seller's agent. Sweeney, 295 Mich. at 363. The possible consequence of forfeiting the $687.50 commission in Sweeney arose from the agent's alleged breach of a duty owed to his purchaser relative to a single land transaction. Here, MDM seeks the broad forfeiture of all commissions earned by GTI, as far back as 2002, more than two years before GTI allegedly breached a duty of loyalty. Equity will not support such an expansive forfeiture, depriving GTI of its right to commissions earned as of no consequence of BCE's assistance of By-Tec. Hull, 224 Mich. at 369; Michigan Oil Co., 148 Mich. App. at 757. MDM's motion to dismiss GTI's breach of contract claim based on a forfeiture of all commissions is without merit as a matter of law and equity. Amway Distributors, 323 F.3d at 390.

With respect to contractual damages, GTI asserts the 2000 Amendment applies and therefore MDM cannot now deduct additional material costs and freight charges under the "value added" commission formula set forth in the 1999 Agreement. Relevant portions of the 2004 Amendment state:

1. The Manufacturer's Representative Agreement, effective September 1, 1999, (hereinafter referred to as the "MRA") . . . is extended pursuant to paragraph 3 thereof for a second five (5) year term.

*      *      *

4. Except as otherwise stated herein the terms of the MRA shall remain in full force and effect.

*      *      *

7. In the event MDM shall default in its obligation to make timely payments as provided in Schedule B attached to this Agreement, then Schedules A and B, attached to this Agreement, shall be deemed null and void and Schedule B attached to the MRA shall be retroactively applied to all invoice payments received by MDM on or after September 1, 2004 and all past due commissions shall be immediately paid by MDM to Representative.

(emphasis added).

This wording of the 2004 Amendment expresses an intent that Schedule B of the 1999 Agreement, applying the "value added" formula by subtracting material costs and freight charges from an invoice before multiplying by the 5% commission rate, would be retroactively applied to invoice payments received by MDM on and after September 1, 2004 if, as has been determined, MDM breached the 2004 Amendment. If the 2000 Amendment rates applied under the same circumstances, GTI would be entitled to a 5% commission on invoice payments without further deductions. As GTI argues, applying the lesser commission rates in the 1999 Agreement would result in penalizing GTI for MDM's breach of the 2004 Amendment.

The parties' contract is made up of at least three written documents, the 1999 Agreement, the 2000 Amendment, and the 2004 Amendment. All three documents must be read as a whole and in light of all of the surrounding circumstances. <u>Detroit Trust</u>, 264 Mich. at 257. While the 2004 Amendment does not expressly incorporate the 2000 Amendment rates, GTI may proffer extrinsic evidence to prove the parties actually intended that the 2000 Amendment rates were to be applied to invoices received by MDM on or after September 1, 2004 if MDM breached the 2004 Agreement. <u>Wonderland Shopping Center</u>, 274 F.3d at 1095. While the parties' pre-suit conduct may be considered as part of the surrounding circumstances in interpreting the actual contractual intent, the issue of which calculation ultimately controls must, on this record, be decided by the trier of fact. <u>Klapp</u>, 468 Mich. at 453-454; <u>Port Huron Ed. Ass'n</u>, 452 Mich. at 323. Whether MDM's new found material and freight costs are legitimate must also be determined by the jury as issues substantially involving MDM's credibility in light of other record evidence. <u>Harris</u>, 20 F.3d

19

at 1403.

To summarize, GTI's breach of contract claim and MDM's breach of contract counterclaim remain viable. GTI waived MDM's alleged failure to pay commissions as a substantial first breach preventing MDM from suing for breach of contract. If MDM prevails on its breach of contract counterclaim by proving to a jury that GTI first substantially breached the parties' contract, GTI will still be permitted to recover sales commissions MDM failed to pay under the contract before GTI's first breach. Equity will not require GTI to forfeit all of its commissions if MDM proves its breach of contract counterclaim. MDM is not estopped or otherwise prevented by its alleged admissions or pre-suit conduct from defending against GTI's claims for breach of contract damages. The breach of contract issues, including damages, must be submitted to and decided by the trier of fact. Amway Distributors, 323 F.3d at 390.

### C. Tortious Interference

GTI seeks summary judgment of MDM's tortious interference counterclaims arguing MDM cannot prove that GTI instigated, induced, or caused Visteon to de-source MDM because it is beyond dispute that Visteon acted in its own best interests following MDM's threats to cease production unless provided with substantial financial assistance. GTI proffers the deposition testimony of former Visteon Purchasing Manager Peter Lynch who testified that the "sole cause" in deciding to de-source MDM was Visteon's history with MDM and MDM's expressed financial difficulties. GTI's Dale Hadel also attests that GTI did not represent By-Tec, and that neither he nor GTI had a financial interest in BCE or By-Tec.

Tortious interference with contract requires proof of: (1) a contract; (2) breach of that

contract; and (3) an unjustified instigation of the breach by the defendant. <u>Health Call of Detroit v. Atrium Home & Health Care Services, Inc.</u>, 268 Mich. App. 83, 90, 706 N.W.2d 843 (2005). Tortious interference with a business expectancy requires proof of: (1) a valid business expectancy; (2) knowledge of the expectancy by the defendant; (3) an intentional interference inducing or causing a breach or termination of the relationship; and (4) resulting damage to the party whose expectancy was disrupted. <u>Id</u>.

MDM's initial argument that proof of proximate cause is eliminated as an element of a tortious interference claim on proof of a per se wrongful act or a lawful act performed with malice and unjustified in law is without merit. As a result of an act of "unjustified instigation," a claim of tortious interference with contract requires proof of a breach of that contract. <u>Health Call</u>, 268 Mich. App. at 90. Unjustified instigation with a contractual relationship without a resulting breach of that contract does not constitute tortious interference with contract. <u>Id</u>. As a result of an act of "intentional interference," a claim of tortious interference with business expectancy requires proof that the intentional act induced or caused the termination of the business relationship. <u>Id</u>. Intentionally interfering with a business relationship without a resulting termination of that relationship does not constitute tortious interference with a business relationship. <u>Id</u>.

In <u>Wilkinson v. Powe</u>, 300 Mich. 275, 1 N.W.2d 539 (1942), relied upon by MDM, the Michigan Supreme Court reasoned that "in light of the evidence . . . the problem of proximate cause disappear[ed] from consideration" because the plaintiff milk-hauler had proven the defendant refused to purchase farmers' milk unless hauled by defendant for the unlawful purpose of bringing about the farmers' breach of their milk-hauling contracts with the plaintiff. <u>Id</u>. at 278, 285. The "problem" of proximate cause disappeared in <u>Wilkinson</u>

because the plaintiff proved a breach of contract resulting from a lawful act done for an unlawful purpose, not because the element of causation was eliminated as a matter of law as an element of tortious interference with contract.

Construing the record evidence in a light most favorable to MDM, however, it remains possible for MDM to prove at trial that GTI's unjustified instigation proximately caused a breach of the Visteon March 21, 2003 "Purchase and Supply Agreement" with MDM,  and/or that GTI's intentional acts induced or caused the termination of MDM's business expectancy with MDM.   An agent is one who acts on behalf of another, particularly with respect to the conduct of business transactions.  Lincoln v. Fairfield-Nobel Co., 76 Mich. App. 514, 519, 257 N.W.2d 148 (1977).  "A principal is responsible for the acts of its agent if done within the scope of the agent's authority."  Caldwell v. Cleveland-Cliffs Iron Co., 111 Mich. App. 721, 731, 315 N.W.2d 186 (1982) (citing Lincoln, 76 Mich. App. at 519).  "[T]he existence of an agency relationship and the scope of the relationship are questions of fact."  Id, at 732 (citing Lincoln, 76 Mich. App. at 520).  Consistent with the court's previous reasoning as to GTI's and BCE's continuing agency relationship, a question of fact remains whether BCE and Bret Evans were acting within the scope of their express or implied authority from GTI when assisting By-Tec in its successful endeavor to secure the Visteon sole source Center Bearing Assembly contract, notwithstanding Hadel's denials of involvement or financial interest.  Amway Distributors, 323 F.3d at 390; Harris, 20 F.3d at 1403.

GTI challenges only the proximate cause element of the tortious interference counterclaims.  The court thus assumes, for purposes of this motion only, that GTI alleged involvement with BCE and Evans in assisting By-Tec was intentional and unjustified, and

that Visteon breached its "Purchase and Supply Agreement" with MDM. It is well settled that there may be more than one proximate cause for a tortious injury. <u>Brisboy v. Fibreboard Corp.</u>, 429 Mich. 540, 547, 418 N.W.2d 650 (1988). Visteon Purchasing Manager Lynch's testimony that Visteon began looking for an alternate source to MDM solely because of MDM's demands for financial advances and threats to cease production does not preclude MDM from proving that BCE's acts, committed within the scope of BCE's authority from GTI, wrongfully deprived MDM of its advantage as the only existing supplier of Center Bearing Assemblies to Visteon, and thus MDM's opportunity to remedy its financial difficulties and deteriorating relationship with Visteon. Stated differently, MDM could prove that BCE's acts wrongfully accelerated By-Tec's transition from a manufacturer of electro mechanical assemblies to a manufacturer of machined parts, causing Visteon to abandon its business relationship with MDM in favor of the unfairly advantaged By-Tec. Lynch's testimony, of course, is also subject to credibility challenges at trial. <u>Harris</u>, 20 F.3d at 1403. GTI is not entitled to summary judgment of MDM's tortious interference counterclaims based on an inability to prove proximate cause. <u>Amway Distributors</u>, 323 F.3d at 390.

### III. Conclusion

GTI's motions for summary judgment of its breach of contract claim and MDM's breach of contract, tortious interference with contract, and tortious interference with business expectancy counterclaims are hereby DENIED. MDM motion for summary judgment of GTI's breach of contract claim is hereby DENIED. This matter will proceed to trial on issues of both liability and damages. A trial scheduling order will issue separately.

SO ORDERED.

Dated:  May 22, 2007

<u>s/George Caram Steeh</u>
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 22, 2007, by electronic and/or ordinary mail.

<u>s/Marcia Beauchemin</u>
Deputy Clerk